IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RANDY REESE, HC-8854,  )
    Petitioner,  )
                                                       )
         v.  )  2:12-cv-1592
                                                       )
MARIROSA LAMAS, et al.,  )
    Respondents.  )

REPORT and RECOMMENDATION

I. Recommendation:

It is respectfully recommended that the petition of Randy Reese for a writ of habeas corpus (ECF 4 and 21) be dismissed and because reasonable jurists could not conclude that a basis for appeal exists, that a certificate of appealability be denied.

II. Report:

Randy Douglas Reese has presented a petition for a writ of habeas corpus which he has been granted leave to prosecute in forma pauperis. Reese is presently serving a life sentence imposed following his conviction by a jury of first degree murder at No. CP-63-CR-520-2005 in the Court of Common Pleas of Washington County, Pennsylvania. This sentence was imposed on June 20, 2007.[1]

An appeal was taken to the Superior Court in which the issues presented were:

1. Did the lower court err when its ruling that the spousal privilege did not apply to the Appellant was based upon incompetent, inadmissible hearsay information?

2. The police gained entry to Appellant's residence and seized evidence subsequently used against him at trial. Entry into the residence was via the purported "consent" of a mentally retarded and deaf tenant, Linda Cape. At the pre-trial suppression hearing, did the Commonwealth fail to meet its burden of proving that Cape's consent was valid…

---

[1] See: ECF 21 at ¶¶ 1-6.

3. The lower court ruled that a threat made by the Appellant to another inmate while in jail pending this trial *two years after the night in question* was admissible because it showed Appellant's "state of mind." Was this error in light of the fact that Appellant's state of mind two years after the murder was clearly not an issue in this case?

4. Did the lower Court err when its basis to admit into evidence a purported prior bad act was that the at-issue evidence constituted an exception to the general prohibition of bad character evidence contained in P.R.E. 404(a), specifically opportunity, when the at-issue evidence instead showed *means* to commit the crime in question, nor opportunity, and *means* is not a delineated exception under 404(b)?

5. Does insufficient record evidence exist to support a conviction of first-degree murder?[2]

On April 21, 2009, a three judge panel of the Superior Court reversed the judgment of sentence and remanded the prosecution for a new trial.[3] On May 4, 2009, an application for reconsideration/reargument was filed; that application was granted on June 26, 2009 and the April 21, 2009 panel decision was withdrawn.[4] At the time of rehearing, the issues presented were:

1. Was the three-member panel correct in reversing the lower Court and in granted the Appellant a new trial in light of the fact that the lower Court violated, in an egregious manner, the Appellant's spousal privilege, which was properly invoked by the Appellant and supported by evidence of record?

2. Did the three-member panel err in not reversing the lower Court for admitting into evidence a baseball cap seized in Appellant's residence when entry into the residence was acquired via the purported "consent" of a deaf and mentally retarded housemate, Linda Cape, who specifically testified that *she could not*

---

[2] See: Brief for Appellant dated February 27, 2008 and filed in the Superior Court. We would be remiss if we failed to comment on the submissions of the District Attorney of Washington County in this and other habeas corpus cases, where the Court is provided with a vast assortment of documents arranged in no particular order and without any rational indexing and then required to hunt through those documents in an effort to secure the necessary record supports. In addition, in his response, the District Attorney does not present any record references as an aide to the Court in conducting its analysis of the petition. While we recognize that supplying the record in this fashion saves the respondent time and energy, it places an improper burden on the Court to do his work for him. In the future, the District Attorney is directed to file his responses in a manner which directs the Court to the appropriate supports in the record for his position, as well as clearly mark the referenced documents and provide an index to those documents.

[3] See: Superior Court Docket 1491 WDA 2007 available on the Pennsylvania Unified Judicial System website, http://ujsportal.pacourts.us.

[4] Id.

*even hear* what the officers were saying to her when they asked her if they could enter and that the sole reason she let the police enter the residence was *because she was afraid*? Further, did the three-member panel overlook the testimony of Government witness and Cape housemate Kathy Hetrick who testified that Cape was (1) hysterical, (ii) out of control, (iii) crying, and (iv) "berserked" simultaneous with letting the Officers enter the residence?

3. Did the three-member panel err by not reversing the lower Court for admitting into evidence a threat by the Appellant to another inmate made *two years after the night in question* ? The lower Court ruled that the threat was admissible because somehow, it showed Appellant's "state of mind" two years prior – on the night in question. Because it in no way demonstrated the Appellant's state of mind two years prior, should the statement/threat be precluded at re-trial?

4. Did the three-member panel err when it declined to reverse the lower Court for admitting a purported prior bad act involving a knife on the purported basis that it constituted admissible evidence under P.R.E. 404(b), specifically of "opportunity", when the evidence merely demonstrated *means* to commit the crime in question, not opportunity, and means is *not* a delineated exception under 404(b)?[5]

On November 4, 2011, the judgment of sentence was affirmed.[6] Neither allowance of appeal to the Pennsylvania Supreme Court nor post-conviction relief was sought.[7]

Reese submitted a timely petition and amended petition for habeas corpus relief in this Court in which the issues raised are:

1. Did the trial court err when it's ruling that spousal privilege did not apply to the appellant which was based upon incompetent inadmissible hearsay information?

2. The police gained entry into appellant's residence and seized evidence subsequently used against him at trial. Entry into the residence was via the purported "consent" of a mentally retarded and deaf tenant, Linda Cape. At the pre-trial suppression hearing, did the Commonwealth fail to meet its burden of proving that Cape's consent was valid …

3. The trial court ruled that a threat made by the appellant to another inmate while in jail pending his trial two years after the night in question was admissible because it showed appellant's true "state of mind."  Was this error

---

[5] See; Substituted brief for reargument.

[6] See: Superior Court Docket 1491 WDA 2007 available on the Pennsylvania Unified Judicial System website, http://ujsportal.pacourts.us.

[7] See: ECF 22 at p.2.

3

in light of the fact that appellant's state of mind two years after the murder was clearly not at issue in this case?

4. Did the trial court err when its basis to admit into evidence a purported prior bad act was that at-issue evidence constituted an exception to the general prohibition of bad character evidence contained in Pennsylvania Rules of Evidence (Rule 404(a)), specifically opportunity when the at-issue evidence instead showed means to commit the crime in question, not opportunity, and means is not a delineated exception under Rule 404(b).

5. Does insufficient record evidence exist to support a conviction of first degree murder?

6. Was the three member panel of the Superior Court correct in reversing the lower court and in granting the appellant a new trial in light of the fact that the lower court violated, in an egregious manner, the appellant's spousal privilege which was properly invoked by the appellant and supported by evidence of record.

7. Did the three member panel of the Superior Court err in not reversing the lower court for admitting into evidence a baseball cap illegally seized in appellant's residence when entry into the residence was acquired via the purported "consent" of a deaf and mentally retarded housemate, Linda Cape, who specifically testified that she could not even hear what the officers were saying to her when they asked her if they could enter and that the sole reason she let the police enter the residence was because she was afraid? Further, did the three member panel overlook the testimony of government witness and Cape's housemate Kathy Hetrick who testified that Cape was (1) hysterical, (ii) out of control, (iii) crying, and (iv) "beserked" simultaneous with letting the officers into the residence?

8. Did the three member panel of the Superior Court err by not reversing the lower court for admitting into evidence a threat by the appellant to another inmate made two years after the night in question? The lower court ruled that the threat was admissible because somehow, it showed appellant's "state of mind" two years prior, on the night in question. Because it in no way demonstrated the appellant's state of mind two years prior, should the statement/threat be precluded at re-trial?

9. Did the three member panel of the Superior Court err when it declined to reverse the lower court for admitting a purported prior bad act involving a knife on the purported basis that it constituted admissible evidence under Pennsylvania Rules of Evidence (Rule 404(b)), specifically of "opportunity" when the evidence merely demonstrated means to commit the crime in question, not opportunity and means is not a delineated exception under Rule 404(b)?

10. Was appellate counsel ineffective for the following reasons:
    i. Counsel's failure to file an appeal in spite of being instructed to do so; and
    ii. Counsel failed/refused to consult with appellant regarding an appeal and appellant expressed an interest and intent to pursue an appeal.[8]

The background to this prosecution is set forth in the November 4, 2011 *en banc* Opinion of the Superior Court:

> On Sunday, February 20, 2005, around 3:45 P.M., Martha Medili reported to police that she had discovered John Lewis dead in his apartment bedroom. Investigation revealed Mr. Lewis had sustained blunt force trauma to his head as well as several stab wound to his chest and a large slice wound to his neck. The immediate crime scene was very bloody but showed little signs of a struggle. Mr. Lewis was found completely naked except for his shoes and socks. There were no signs of forced entry. There were, however, signs of an attempted cleanup that, in addition to Mr. Lewis' extensive blood loss, the heat, and the moisture in the apartment, severely compromised the collection of solid fingerprints or DNA evidence. The apartment building where Mr. Lewis lived and was found had surveillance cameras, which recorded the entry and exit of the residents and visitors. The authorities obtained the actual surveillance tapes and observed Appellant several times on the surveillance tape recordings for Saturday, February19, 2005, and very early Sunday morning, February 20, 2005. Appellant was wearing a distinctive baseball cap and an identifiable sweatshirt. Further investigation led the police to arrest Appellant on Thursday, February 24, 2005, for the murder of Mr. Lewis…
>
> Appellant filed an omnibus pretrial motion to suppress the baseball cap, any and all statements of Appellant made on February 24, 2005, subsequent to his arrest, all photographs depicting cuts on Appellant's hands and head, and testimony about the cuts. Appellant also challenged the lawfulness of his arrest and moved to quash the criminal information. The court held the suppression hearing on May 20, 2006 … By opinion and order entered October 23, 2006, the court denied Appellant's motion to suppress evidence, to declare the arrest unlawful, and to quash the criminal information…
>
> The Commonwealth filed a motion *in limine* on April 16, 2007, to admit, *inter alia*, the testimony at trial of Janise Kohn, Appellant's putative wife, regarding certain statements Appellant had made in a telephone call to her on Sunday evening, February 20, 2005, as well as in two other telephone calls he made to her on the ensuing days. On April 18, 2007, Appellant filed his own motion *in limine* to preclude, *inter alia,* Janise Kohn's testimony, claiming the content of the

---
[8] See: ECF 33 at pp. 3-5.

telephone conversations at issue constituted confidential communications made during their marriage.

On Monday, April 23, 2007, the court held a hearing on the warring motions *in limine*. With respect to Appellant's invocation of the spousal privilege, Janise Kohn testified regarding her relationship with Appellant. She stated she had known Appellant for about five years and married him in a ceremony of July 18, 2002. She filed for a divorce in 2006. Appellant signed an affidavit of consent for the divorce in September 2006…She said she did not file for a divorce sooner because she was afraid of Appellant and what he might do, given his continued threats of harm to her and to himself…

Sometime in January 2005, Appellant told Ms. Kohn he was staying with another woman, Linda Cape, and intended to sleep with her…

The next time Ms. Kohn heard from Appellant was on the evening of Sunday, February 20, 2005, when he called to tell her that Mr. Lewis was dead, and not from natural causes…

Appellant testified. He asserted Ms. Kohn was his wife in February 2005, when he made the telephone calls at issue; and that he expected the content of the calls to be confidential… Appellant conceded that when he made the telephone calls to Ms. Kohn in February 2005, he was seeing another woman. Still, he claimed he expected the calls would be confidential…

The Commonwealth asked Appellant about a woman named Crystal [and he testified that he had married her in either 1999 or 2000 and that they divorced in 2003]. Essentially, Appellant could not remember the date of the purported divorce from Crystal Enos, he signed no papers related to any divorce proceedings, he did not know where the divorce was granted, and he could not obtain or produce a copy of that divorce decree…

The Commonwealth said its independent research could not confirm Appellant's alleged divorce from Crystal Enos. The Commonwealth argued Appellant presented no credible evidence of a divorce from Crystal Enos. Given no lawful marriage between Appellant and Janise Kohn, the content of Appellant's calls to Ms. Kohn was admissible at trial…

The defense produced no competent evidence to support Appellant's claim of a divorce from Ms. Enos or a lawful marriage to Ms. Kohn. Based on the testimony of record, the court determined Appellant had a duty to show a valid marriage to Janise Kohn, which he failed to do. Accordingly, the court ruled Appellant could not assert the spousal privilege under Section 5914 to bar Ms. Kohn's testimony.

During the trial, the Commonwealth produced significant other evidence tying Appellant to the crime including, but not limited to, the unnatural death of Mr.

Lewis, a homicide caused by sharp and blunt force trauma; surveillance videotapes capturing Mr. Lewis allowing a man, wearing a hooded "AERO" sweatshirt and baseball cap with circular emblem, to enter the building on Saturday night at about 11:06 P.M.; surveillance videotapes showing a man leaving the building forty-five minutes later, wearing Mr. Lewis' winter coat and carrying a plastic bag; surveillance videotapes showing Appellant, wearing an AERO sweatshirt and baseball cap with circular emblem, trying to gain entry to the building at about 1:06 A.M.; testimony from Detective Stanek that, based on the video footage, Appellant was the last person seen with Mr. Lewis before his death; testimony from two other persons … identifying the man on the surveillance videotapes as Appellant; testimony from another resident who confirmed Appellant's presence in the building late at night on February 19th and early in the morning on February 20th; clear, color surveillance videotape from February 18th, taken at the courthouse, showing Appellant wearing an identical AERO sweatshirt and baseball cap; a baseball cap recovered from Appellant's residence, containing Mr. Lewis' DNA in miniscule blood splatter; Appellant's knowledge of the crime as conveyed to others, including a statement to a housemate, Cathy Hetrick, and three later telephone calls to Janise Kohn; Appellant's efforts to elude police when they came to arrest him; evidence that Appellant possessed a knife: and testimony from another inmate, who said Appellant had threatened him, over a commissary debt, with color photos from the Lewis homicide together with boastful intimidations.

Importantly, with respect to Appellant's knowledge of the crime before Mr. Lewis' body was even discovered, the Commonwealth produced the testimony of Cathy Ketrick, who lived … with Appellant, Linda Cape, and others. Ms. Hetrick revealed Appellant was at her house around 10:30-11:00 A.M. on Sunday morning, February 20, 2005. Appellant told Ms. Hetrick he had received a cell phone call "that some guy got killed up there [at John Lewis' apartment house]." Mr. Lewis' body was not discovered until after 3:00 P.M. on February 20th.[9]

It is provided in 28 U.S.C. §2254(b) that:

An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

This statute represents a codification of the well-established concept which requires that before a federal court will review any allegations raised by a state prisoner, those allegations must first be presented to that state's highest court for consideration. Preiser v. Rodriguez, 411

---

[9] See: November 4, 2011 Opinion of the Superior Court at pp. 1-12.

7

U.S. 475 (1973); Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484 (1973); Doctor v. Walters, 96 F.3d 675 (3d Cir. 1996).

It is only when a petitioner has demonstrated that the available corrective process would be ineffective or futile that the exhaustion requirement will not be imposed. Preiser v. Rodriguez, supra.; Walker v. Vaughn, 53 F.3d 609 (3d Cir. 1995).

If it appears that there are available state court remedies, the court must determine whether a procedural default has occurred. If a procedural default has occurred, the court must determine whether cause or prejudice exists for the default, or whether a fundamental miscarriage of justice would result from a failure to consider the claims. Carter v. Vaughn, 62 F.3d 591 (3d Cir. 1995).

In construing § 2254(d)(1), the Court in Williams v. Taylor, 529 U.S. 362, 412-413 (2000) stated:

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.
> We must thus decide whether the state supreme court's "adjudication of the claim ... resulted in a decision that was *contrary to*, or involved *an unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States...
>
> A state court adjudication is "contrary to" Supreme Court precedent if it results from the application of "a rule that contradicts the governing law set forth" by the Supreme Court or is inconsistent with Supreme Court decision in a case involving "materially indistinguishable" facts ... "A state court decision fails the 'unreasonable application' prong only 'if the court identifies the correct governing

8

rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case or if the state court either unreasonably extends a legal principle from the Supreme court's precedent to a new context where it should not apply or unreasonably refuses to extend the principle to a new context where it should apply...(citations omitted).

That is, the state court determination must be objectively unreasonable. Renico v. Lett, 130 S.Ct. 1855 (2010).

In his petition Reese seeks to raise ten issues. However, issues 1 and 6 are identical since they challenge the admission of "spousal" testimony. Issues 2 and 7 are identical since they seek to challenge the legality of the search and seizure which occurred at his residence. Issues 3 and 8 are identical since they challenge the testimony of an inmate about petitioner's state of mind two years earlier. Issues 4 and 9 are identical in that they challenge the admissibility of prior bad acts under P.R.E. 404(a). Issue 5 seeks to challenge the sufficiency of the evidence to produce a conviction and issue 10 seeks to challenge the effectiveness of appellate counsel. While the fifth issue was raised in the first appeal to the Superior Court it was not raised before the *en banc* court and since it can no longer be raised in the Pennsylvania court's a procedural default has occurred. In addition, the alleged claim of the ineffectiveness of counsel was never raised in the courts of the Commonwealth and is likewise procedurally defaulted. In Coleman v. Thompson, 501 U.S. 722,750 (1991), the Court held:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice.

Because no such showing is made here, the petitioner has failed to avail himself of the available state court remedies on these two issues, no further consideration of these claims is warranted here and we need only address the petitioner's first four issues.

The first issue concerns the introduction of testimony from his "spouse". This issue arises under 42 Pa.C.S.A. §5913 ("in a criminal proceeding a person shall have the privilege, which he or she may waive, not to testify against his or her then lawful spouse…"). This matter was raised before the *en banc* Superior Court which thoroughly reviewed the trial record and concluded that the petitioner was unable to demonstrate that a valid marriage existed to Janise Kohn and for

this reason he could not assert spousal immunity.[10] In addition, the Superior Court conducted a thorough analysis of the privilege specifically observing:

> Appellant admitted (1) he and Janise Kohn had "married" while he was still married to Crystal Enos; (2) he could not remember the date of his alleged divorce from Ms. Enos; (3) he signed no papers related to a divorce proceeding; (4) he did not know where the divorce was granted; and (5) he could not produce a copy of that divorce decree. Appellant's mere assertion of a marriage to Ms. Kohn was insufficient to establish its validity… [For this reason] the presumption of the continued validity of his first marriage to Crystal Enos prevailed over the alleged validity of a second marriage to Ms. Kohn. Because Appellant failed to show a lawful marriage to Ms. Kohn, the Commonwealth had nothing to disprove, and the court correctly decided Appellant could not invoke Section 5914 to bar Ms. Kohn's testimony at trial (footnote omitted).[11]

The question of the admissibility of the testimony of Ms. Kohn was decided as a matter of state law, and as such is not subject to review here. Swarthout v. Cooke, 131 S.Ct. 859 (2011). For this reason, Reese's allegation does not provide a basis for relief.

Petitioner's next issue is that the seizure of his baseball cap from his residence was illegal as a result of the police securing consent to the search from one of petitioner's housemates, Linda Cape, who was "deaf and mentally retarded." In reviewing the contention, the *en banc* Superior Court wrote,

> The suppression court has sole authority to assess the credibility of the witnesses and is entitled to believe all, part or none of the evidenced presented…[12]

After conducting a suppression hearing, the trial court wrote:

> All of the residents of 25 West Walnut had access to the common rooms on the first floor as well as the basement. Thus, Ms. Cape had joint access to and control of the same areas of the house as the Defendant and had the authority to consent to a search of the premises. Her third party consent satisfied the requirements for the exception to a warrantless search.
>
> It is clear that Ms. Cape had the authority to consent … yet the Defendant contended that her mental and physical disabilities prevented her from giving legal consent… As Ms. Cape's caseworker for over sixteen years, Ms. O'Meara explained that Ms. Cape was "borderline intellellectual[ly] functioning" and was very adept at performing everyday tasks of living… Additionally, the Defendant claims that Ms. Cape was incapable of giving valid consent because she is deaf

---

[10] See: November 4, 2011 Opinion of the Superior Court at p.10.
[11] Id. at pp. 23-24.
[12] Id. at p. 27.

10

and was not wearing her hearing aids on the evening of the search. It has not been
established that Ms. Cape is deaf, but it is know that Ms. Cape has hearing and
speech impairments….

From her demeanor and responses to questioning, this Court found that she was
capable of hearing and comprehending others. Ms. Cape demonstrated ample
mental sophistication on the witness stand. Therefore, this Court determined that
Ms. Cape was mentally and physically capable of giving legal consent to search.

Defendant's final argument regarding the validity of Ms. Cape's consent
challenged the voluntariness of her consent….

Detective Stanek was the only officer who spoke with Ms. Cape and he did so
calmly and respectfully. Detective Stanek testified that he knew Ms. Cape from
prior contact with her, and thus was familiar with her impairments and general
demeanor… There was no attempt to enter the residence with force or aggressive
tactics. That five officers were present in Ms. Cape's view from the doorway does
not amount to police excesses; the officers were prepared to arrest a suspect in a
violent murder case. Ms. Cape … had the capacity to consent to a search, and did
so. Considering the totality of the circumstances, from the testimony of Detective
Stanek and Linda Cape, it is clear that the encounter between these two
individuals was a peaceful one, and Ms. Cape's consent was not coerced.

Next, Defendant avers that the officers illegally seized the red baseball cap,
arguing that the cap was not in plain view subject to seizure…. The officers
entered and searched for Reese throughout the residence… While standing in the
dining room with the occupants of the house, Detective Aiello noticed a red
baseball cap atop a pile of clothing on the dining room floor, which he
immediately associated with the one seen on the videotapes … The officers seized
the cap. [13]

In <u>Stone v. Powell</u>, 428 U.S. 465 (1976), the Court held that where the state courts have provided a full and fair opportunity to litigate a Fourth Amendment issue, federal habeas courts should not reexamine a state court's Fourth Amendment resolution of the issue. Because the state court held a full hearing in which it concluded that the consent of Ms. Cape was voluntary and that the seized cap was in plain view, this conclusion is determinative here and petitioner's allegations do not provide a basis for relief.

Reese's next contention is that the trial court improperly admitted the testimony of inmate Robert Pataski, who stated Appellant had threatened him prior to trial with the graphic, color crime-scene photographs from the Lewis homicide. Appellant argues the testimony was

---

[13] See: Trial Court's Opinion filed September 10, 2007 at pp.9-12.

11

irrelevant to show his present callousness or his "mental state" at the time of the homicide, where callousness is quintessential bad character evidence inadmissible at trial. Further, even if the testimony were irrelevant, then its prejudicial effect outweighed its probative value.

In order to provide a basis for federal relief, alleged evidentiary errors must rise to the level of a due process violation. Keller v. Larkins, 251 F.3d 408 (3d Cir.), cert. denied 534 U.S. 973 (2001). In reviewing this claim, the trial court wrote:

> [T]he jail had received a report from an inmate [Pataski] who had been threatened by Defendant Randy Reese with 8" x 10" color crime scene photos from the Lewis homicide… Since Pataski owed Randy Reese a commissary debt which he planned to discontinue paying, Reese allegedly threatened Pataski by saying something to the effect of, "make the money right or this will be you" …
>
> [T]he Court found that Inmate Pataski's testimony was relevant and that its probative value was not outweighed by the danger of unfair prejudice. Pataski's testimony that the Defendant, just a few days prior to his trial, used gruesome crime scene photos from the murder he was charged with committing to threaten Pataski tends to make the existence of certain facts of the case more probable than they would be without this testimony … the defense put forth the theory that it was highly unlikely that Reese would kill one of his own friends. However, regardless of whether Reese was actually the killer, the fact that Reese could be so callous as to use horrific, blood-soaked crime scene photos depicting his purported "friend" nude with a slashed throat and eleven stab wounds in a pool of his own blood, is very probative of Reese's mental state. [14]

Thus, this evidence was highly probative of the credibility of the defense's argument that the petitioner could not have committed this crime, and does not provide support for a due process violation claim.

Petitioner's final argument is that he is entitled to relief on the basis of the admission at trial of his prior bad acts. Specifically, as the Superior Court noted,

> [Appellant] next alleges that the [c]ourt erred in admitting the testimony of Janise Kohn as to a January 13, 2005 incident which occurred at her work site, Big Lots, wherein [Appellant] allegedly flashed a knife, … The [court] admitted this testimony pursuant to Rule 404(b)2), as proof that [Appellant] possessed a knife just five weeks prior to the murder of John Lewis and that this possession provided [Appellant] with the opportunity to commit the crime…[15]

In reviewing this issue, the trial court wrote:

---

[14] See: Trial Court's Opinion filed September 10, 2007 at pp. 21-23.
[15] See: November 4, 2011 Opinion of the Superior Court at pp. 35-36. As noted below, the trial court admitted the testimony pursuant to Rule 406 and not Rule 404 as noted by the Superior Court.

> The Defendant argues that the Court erred in permitting Janise Kohn to testify to Reese's purported habit of carrying knives. Prior to trial, the Commonwealth presented a Motion in Limine to Permit Presentation of Evidence of Defendant's Purported Habit of Carrying Knives. The prosecution planned to introduce testimony from Reese's estranged putative wife, Janise Kohn, as to various incidents in which he used knives in her presence to establish that his general possession of knives demonstrated his access to a possible murder weapon. The defense opposed the admission of all knife-related incidents as inadmissible prior bad acts under Rule 404 of the Pennsylvania rules of Evidence.
>
> Following argument on this Motion on April 20, 2007, the Court ruled that Reese's general prior possession of knives was admissible under [*Pennsylvania*] *Rule of Evidence 406* because it was relevant and established Reese's habit of carrying knives. The Court, in permitting the introduction of this evidence, emphasized that Ms. Kohn would not be allowed to testify as to Reese's prior bad acts that involved knives; she would only be allowed to testify as to her general observation that she knew him to carry knives.
>
> Rule 406 provides that "[e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to provide that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice" Pa.R.E. 406. (emphasis added). [16]

Thus, this issue was likewise decided as a matter of Pennsylvania law and is not subject to review here.[17] For this reason, this claim likewise does not provide a basis for relief. Swarthout v. Cooke, supra.

For the reasons set forth above, it appears that Reese's conviction was not secured in any manner contrary to federal law as determined by the United States Supreme Court nor involved any unreasonable applications of those determinations. Accordingly, he is not entitled to relief here and it is recommended that the petition of Randy Reese for a writ of habeas corpus be dismissed and because reasonable jurists could not conclude that a basis for appeal exists, that a certificate of appealability be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections within fourteen (14) days of this date and mailing them to United States District Court, 700 Grant Street, Pittsburgh PA 15219-1957. Failure to file timely objections will waive the right to appeal.

---

[16] See: Trial Court's Opinion filed September 10, 2007 at p. 16.
[17] We parenthetically note that this same conclusion would be compelled under Fed.R.E. 406.

Filed: July 2, 2013

Respectfully submitted,
s/ Robert C. Mitchell
United States Magistrate Judge